JOSEPH A. HAAG, APPELLEE, V. ALFRED M. BONGERS AND
DELORES D. KUHL, PERSONAL REPRESENTATIVES OF THE
ESTATE OF LEO J. BONGERS, DECEASED, APPELLEES AND
CROSS-APPELLANTS, WILLIAM J. DOLAN, DOING BUSINESS AS
DOLAN REALTY AND AUCTION CO., AND
BAUER-MORAVEC AUCTIONEERS AND CLERKS, APPELLEES, AND
PUTNAM HITCH PRODUCTS, INC., APPELLANT AND CROSS-APPELLEE.

589 N.W. 2d 318

Filed February 12, 1999. No. S-97-1243.

Brien M. Welch, of Cassem, Tierney, Adams, Gotch & Douglas, for appellant.

Kevin R. McManaman and Thomas J. Culhane, of Erickson & Sederstrom, P.C., for appellees Bongers and Kuhl.

M.J. Bruckner and John W. Ballew, Jr., of The Bruckner/ Ballew Law Firm, P.C., for appellee Haag.

Wright, Gerrard, Stephan, McCormack, and Miller-Lerman, JJ.

Miller-Lerman, J.

## I. NATURE OF CASE

Putnam Hitch Products, Inc. (Putnam), appeals and Alfred M. Bongers (Bongers) and Delores D. Kuhl (Kuhl), personal representatives of the estate of Leo J. Bongers (collectively, the Estate), cross-appeal from a jury verdict in the amount of $600,000 in favor of Joseph A. Haag (Haag) and against the Estate, Dolan Realty and Auction Co. (Dolan), Bauer-Moravec Auctioneers and Clerks (Bauer-Moravec), and Putnam for injuries Haag sustained on January 30, 1993, while attending an antique vehicles auction on the Estate's premises. Haag was injured when a hitch ball used in towing a vehicle flew off the towing rig and hit Haag on the right side of his skull and his right eye. For the reasons stated below, we affirm the trial court's order entering judgment on the jury's verdict.

## II. BACKGROUND

Leo Bongers died intestate on October 8, 1992. Subsequently, Bongers and Kuhl, Leo Bongers' nephew and niece, were appointed as personal representatives of his estate. Upon his death, Leo Bongers left substantial real and personal property, including more than 120 antique cars, trucks, and motorcycles.

In late October 1992, Russ Moravec of Bauer-Moravec contacted the Estate and offered his services as auctioneer. Upon doing so, Moravec learned that Bill Dolan of Dolan had also

contacted the Estate. On November 2 or 3, the Estate concluded that Bauer-Moravec and Dolan should conduct the auction of the vehicles jointly and split all of the expenses and commissions relating to the sale. On November 3, the Estate, Bauer-Moravec, and Dolan signed a written agreement to this effect. Therefore, in this opinion, Bauer-Moravec and Dolan will be referred to collectively as "the auctioneers."

Moravec recommended that the auction be held in May, June, or July 1993, at an airstrip in Butler County. This arrangement would have allowed the parties to line up the vehicles in a row outside in good weather so that people attending the auction could go from car to car and the vehicles would not need to be moved during the auction. Moravec was concerned that some of the older vehicles would not be in operating condition if the sale were held earlier, and Moravec favored having the auction at this site in this fashion because it would allow the parties to conduct the auction in a safe manner. The Estate rejected Moravec's recommendation and insisted that the sale be conducted in January 1993.

The auction was held on property owned by the Estate, a farm located 1½ miles south of David City on the west side of Highway 15. The Estate and the auctioneers decided that the auction would be held inside because of probable bad weather, in a building owned by the Estate that opens at both ends.

In order to prepare for the sale, the Estate was to put the vehicles in running order, while the auctioneers attempted to locate all of the titles for the vehicles and to arrange for volunteer assistants to help with the sale. The Estate specifically approved the use of assistants for the auction. One of the assistants, Doug Reznicek, had previously assisted Bauer-Moravec in preparing for other auctions. Reznicek assisted in making arrangements to move the vehicles into and out of the sale building. The evidence shows that initially, the Estate was unsure that it would pay the assistants, but that after the sale, the Estate paid Reznicek, as well as all of the other assistants, except one, out of Estate funds.

Prior to the sale, the auction was heavily advertised at the Estate's insistence. As the auction approached, the parties were flooded with telephone calls regarding the sale. A joint decision

was made by the Estate and the auctioneers to open both ends of the auction building and add tents on either side to accommodate more people. A joint decision was made to charge each person wishing to enter the bid barn $25, and a separate tent was set up with a remote broadcast of the auction so that people could watch the auction without paying the $25 fee. If a bidder actually purchased a vehicle, the Estate refunded the $25 fee.

As the auction grew closer, it became apparent that the Estate would not have many of the vehicles in running order in time for the sale. A joint decision was made to tow the vehicles into the building. The vehicles were towed with small tractors which the auctioneers borrowed from farmers in the surrounding community. In order to attach the antique vehicles to the tractors, Scot Bauer, of Bauer-Moravec, purchased Putnam hitch balls and Bauer's wife purchased ropes. Mylar-type ropes were used instead of chains to tow the vehicles so that the antique vehicles which were not in running order would not be harmed.

The auction took place on January 30, 1993, beginning at 9:30 a.m. Throughout the auction, 1,300 people paid the $25 bid fee. The Estate and the auctioneers planned to sell a vehicle every 3 minutes. It was very cold on the day of the sale, with temperatures well below freezing. The bid barn was crowded, and the vehicles were towed on a path through the crowd into an area for viewing and bidding. The crowd was standing shoulder to shoulder. There were no barriers to separate the crowd from the vehicles. Given the configuration of the barn and the bidding area, it was necessary for the assistants to physically move people back in order to pull the vehicles through the building.

Before the sale, Reznicek met with the assistants and instructed certain of them to attach the hitch balls to the drawbars of the tractors with a rope in order to tow the vehicles. At trial, Reznicek testified that he did not directly or indirectly tell anyone how to install a hitch ball on a drawbar and that he gave the hitch balls to persons who presumably knew how to properly attach a hitch ball to a tractor drawbar. Reznicek stated that during the preauction meeting, he gave the assistants general safety instructions. The evidence shows that it is common knowledge within the Butler County farming community that all threads on the nut of a hitch ball must be engaged for proper installation.

Approximately 1 hour into the sale, with approximately 700 to 800 people in the bid barn, an antique Studebaker truck was towed through the crowd into the building and sold. After the sale, assistants attempted to tow the Studebaker truck out of the building and experienced difficulty in doing so. As the assistants attempted to tow the vehicle, the hitch ball became detached from the drawbar, flying off the tractor and hitting Haag, who was standing at the back left of the tractor. Because of the accident, Haag suffered serious injuries to his head, which are not contested on appeal.

The evidence shows that the drawbar on this tractor was double the size of a drawbar normally found on this type of tractor and that all threads on the shank of the hitch ball had not been engaged. Reznicek did not inspect the tractors prior to the sale to see if the hitch balls were properly attached to the drawbars, nor did the auctioneers or the Estate. The evidence shows that Bongers was on the premises during most of the auction.

After the accident, the assistants used chains and not ropes to tow the vehicles in and out of the building. No other accidents occurred during the sale.

On September 9, 1997, Haag filed a fourth amended petition against the Estate, Dolan, Bauer-Moravec, and Putnam. Haag alleged that he had suffered injuries while attending the auction on January 30, 1993, on premises owned by the Estate. Haag alleged that he was a business visitor on the premises owned by the Estate and that the auction was held by Bongers and Kuhl in their capacity as personal representatives. Haag alleged that the Estate employed Dolan and Bauer-Moravec to conduct the auction. Haag alleged that all decisions with respect to the conduct of the auction were cleared with the Estate.

Haag alleged that he was injured when the hitch ball came loose from the drawbar of the tractor towing the Studebaker truck. Haag alleged that the towrope propelled the hitch ball through the air and that it struck Haag on the right side of his skull and his right eye.

Haag alleged that the hitch ball was installed in a negligent manner by one of the assistants utilized by the Estate, Dolan, and Bauer-Moravec to assist in the auction. Haag alleged that this individual was negligent in several regards: (1) in using the

hitch ball in a manner for which it was not intended; (2) in placing the shank or screw of the hitch ball in a drawbar hole which was too large; (3) in placing the hitch ball in a drawbar which was too thick for the hitch ball that was being used; (4) in failing to fully engage the nut with the screw of the hitch assembly; and (5) in using a Mylar-type towrope, which created an unreasonable risk of harm to Haag and the other occupants of the building because it acted like a slingshot when the hitch failed. Haag alleged that the negligence of this individual was imputed to the Estate, Dolan, and Bauer-Moravec, under the doctrines of respondeat superior and vicarious liability. Additionally, Haag alleged that the towing procedures engaged in at the auction constituted unreasonably and inherently dangerous activities and that therefore the Estate had a nondelegable duty to make sure that the auction was conducted in a safe manner on its premises.

Haag alleged that the Estate was negligent in the following ways: (1) in failing to correct the manner in which the hitch balls were being used to tow the vehicles into the bid barn when they knew, or in the exercise of reasonable care should have known, that the manner in which the hitch balls were being used was unreasonably dangerous and created an unreasonable risk of harm to the occupants of the bid barn; (2) in failing to limit the number of people in the bid barn so that the bidders could be kept at a safe distance from the towing process; and (3) in failing to warn Haag and the other business visitors that the vehicles were being towed in an unreasonably dangerous manner.

Haag alleged that Dolan was negligent in conducting the auction when he knew, or by the exercise of reasonable care should have known, that the vehicles were being towed in an unreasonably dangerous manner in close proximity to the bidders and that the bid barn was too crowded to carry out the auction in a reasonably safe manner. Haag alleged that Dolan was also negligent in failing to warn Haag and the other bidders that the vehicles were being towed in an unreasonably dangerous manner.

Haag alleged that Bauer-Moravec was negligent (1) in arranging to have the vehicles, and in particular, the Studebaker truck, towed in an unreasonably dangerous manner; (2) in

selecting a Mylar-type rope instead of a chain to provide the connection between the towing tractor and the towed vehicles; (3) in failing to inspect the drawbar and the hitch of the tractor that was towing the Studebaker truck; (4) in conducting the auction when it knew, or in the exercise of reasonable care should have known, that the bid barn was too crowded to carry out the auction in a reasonably safe manner; and (5) in failing to warn Haag and the other bidders that the vehicles were being towed in an unreasonably dangerous manner.

Haag alleged that at the time of the accident, Bauer-Moravec was acting as an agent for the Estate and that Bauer-Moravec's negligence was imputed to the Estate under the doctrines of respondeat superior and vicarious liability.

Haag also alleged that Putnam was strictly liable for Haag's injuries in manufacturing, designing, and placing on the market a hitch ball manufactured of nonfree machine steel which was inadequate to support the foreseeable forces to which the hitch ball would be subjected. Additionally, Haag alleged that Putnam was strictly liable in failing to provide the following instructions and warnings with its hitch ball: (1) Use the hitch ball only for towing trailers or vehicles connected to the ball with a socket-type coupler that matches the ball size; (2) attach it to a platform at least three-eighths of an inch thick; mounting hole must not exceed ball shank diameter by more than one-sixteenth of an inch; (3) do not exceed gross trailer weight shown on ball; (4) always use a lockwasher and position it next to nut; (5) threaded shank must protrude beyond bottom of nut when tightened; (6) check nut tightness every time the trailer is hooked up and at the beginning of each towing day; tow only if nut is tightened as specified; (7) replace any damaged or worn part; (8) never attach a towrope, chain, cable, or stretch-type elastic rope to hitch ball or safety chain or other attachment with a ball; and (9) lubricate ball and coupler to minimize wear and friction; coupler must not bind on ball.

Haag alleged that the various alleged acts were the direct and proximate cause of his injuries and that he sustained serious personal injuries consisting of the loss of his right eye; fractured periorbital bones, including the frontal bone, the zygomatic bone, and the maxillary bone; and multiple lacerations and

abrasions. Haag requested special damages in the amount of $41,846.48, general damages as determined by law, and costs of the action. Specifically, Haag requested damages for past and future physical pain and mental suffering; current and future medical expenses; past and future loss of income; permanent injury and disability; permanent disfigurement; and permanent impairment of earning capacity.

On September 8, 1997, Bauer-Moravec filed an answer, stating that Haag's fourth amended petition failed to state a cause of action against it and requesting that Haag's petition be dismissed with prejudice.

On September 9, 1997, Putnam filed an answer, admitting that it is a corporation organized and existing under Michigan law and that prior to January 30, 1993, it manufactured hitch balls that were placed into the stream of commerce and distributed and sold throughout the United States, including Nebraska. Putnam denied each and every other allegation contained in Haag's fourth amended petition, except those constituting admissions against Haag's interest. Putnam stated that the other named defendants or others unknown to Putnam had exclusive control, use, and custody over the hitch ball and its assembly and were misusing the hitch ball at the time of the accident. Putnam stated that this misuse was a proximate cause of any damages or injuries that Haag incurred. Additionally, Putnam stated that its hitch ball did not need to be accompanied by warnings because warnings were not necessary or appropriate for the hitch ball's intended use and purpose.

On September 9, 1997, the Estate also filed an answer. In its answer, the Estate stated that it had contracted with Bauer-Moravec and Dolan as independent contractors to conduct the auction and that the auction took place on farm real estate owned by the Estate. The Estate stated that Haag's petition failed to state a cause of action against it and that Putnam was strictly liable to Haag for his injuries.

A jury trial was held on September 9 through 12 and 15 through 16, 1997. Fifteen witnesses testified at trial, and the record consists of 740 pages of testimony and 173 exhibits. Much of the testimony at trial has been set out in the preceding

portion of this opinion, except the testimony of the two expert witnesses who appeared at trial.

William Weins, an associate professor of mechanical engineering at the University of Nebraska-Lincoln, testified on Haag's behalf and stated that he reviewed the following items involved in the accident: the hitch ball, the towrope, and the drawbar, as well as another Putnam hitch ball not involved in the accident and three hitch balls from other manufacturers.

Weins testified that it was his opinion, with a reasonable degree of scientific certainty, that the Putnam hitch ball involved in the accident was unreasonably dangerous because (1) it was not being used with a coupler, as it was intended to be; (2) the hitch ball was placed in a drawbar that was too thick; (3) only two threads were engaged on the shank of the hitch ball; and (4) a towrope was used, which stored energy and acted like a slingshot when the hitch ball became detached from the drawbar.

Weins testified that the accident would not have occurred if four or five threads had been engaged on the shank of the hitch ball and that the threads would have been fully engaged on the shank of the hitch ball if a hitch ball with a longer shank had been used. Essentially, Weins stated that the hitch ball was not the proper size for the drawbar and that as a result, the hitch ball was not securely attached to the drawbar. Weins testified that all of the above misuses were reasonably foreseeable to a hitch ball manufacturer and that other manufacturers in the industry supplied warnings against these misuses. Weins stated that the Putnam hitch ball was unreasonably dangerous because it did not warn against any of the foreseeable misuses or events and that Putnam's failure to warn on the proper use of this device was the proximate cause of Haag's injuries. On cross-examination by Putnam, Weins testified that he could not say that had there been warnings in the instant case, they would have been followed.

Weins testified that Putnam should have attached the following warnings to its hitch balls: (1) This hitch ball is for application with a coupler; (2) use this hitch ball only with drawbars three-fourths of an inch thick; (3) engage all of the nuts on this

hitch ball; (4) place this hitch ball only in a hole of a certain size; (5) keep the hitch ball lubricated; and (6) do not attach other devices to the hitch ball, specifically, polymer towropes.

Weins testified that the drawbar on the tractor involved in the accident was 1½ inches thick, twice as thick as the average drawbar on this size tractor. Weins testified that the hitch ball used was close to the correct size and that it was not unreasonable to believe that this hitch ball would have been suitable for this drawbar. Weins also stated that the nut on this particular hitch ball was securely tightened and that the only way an installer could have determined if all the threads were fully engaged was by looking underneath the drawbar or by feeling with his or her fingers.

Rex Paulsen, a professional engineer at Fay Engineering, testified on Putnam's behalf. Paulsen testified that using this particular hitch ball on the drawbar in question, without engaging all of the threads, was a misuse of the Putnam hitch ball and that this misuse was a proximate cause of the accident. Paulsen stated that placing this hitch ball in a hole that was too large, in a drawbar that was 1½ inches thick, engaging only two threads, and using a towrope created a risk of harm, readily recognizable by an ordinary user. Paulsen stated that all of the above misuses were foreseeable misuses. In contrast, in later testimony he stated that in his opinion, it was not a reasonably foreseeable misuse of the hitch ball that a person would engage only two threads on a drawbar that is 1½ inches thick.

On September 16, 1997, the jury returned a verdict finding for Haag and against the Estate, Bauer-Moravec, and Putnam in the amount of $600,000. Previously, the trial court had adjudged Dolan to be in default and entered judgment on the pleadings against Dolan and in favor of Haag.

On September 25, 1997, the Estate and Putnam filed separate motions for judgment notwithstanding the verdict or, in the alternative, for a new trial. On October 1, Dolan filed a suggestion in bankruptcy.

In an order and judgment filed October 29, 1997, the trial court overruled the Estate's and Putnam's posttrial motions and stayed any further action against Dolan. The trial court entered judgment on the jury's verdict in the sum of $600,000 in favor

of Haag and against the Estate, Bauer-Moravec, and Putnam. Further facts are recited below as are necessary to our analysis.

Putnam appeals, and the Estate cross-appeals.

## III. ASSIGNMENTS OF ERROR

On appeal, Putnam contends that the trial court erred in not granting its motion for a directed verdict because the issue of whether Putnam was strictly liable for failing to attach warnings to its hitch ball should not have been submitted to the jury and because Haag failed to establish that Putnam's failure to include warnings with its hitch ball with respect to foreseeable misuses was a proximate cause of Haag's injury. Additionally, Putnam argues that although counsel for Putnam commented in closing upon warnings, the trial court abused its discretion in not allowing Putnam's counsel to state in his closing argument that the evidence established that if a warning had been given by Putnam, it would not have been read or heeded.

On cross-appeal, the Estate argues that the trial court erred (1) by instructing the jury that a mere principal-agent relationship between the Estate and Bauer-Moravec was sufficient to create vicarious liability upon the principal, the Estate, for the physical tort of its agent, Bauer-Moravec, acting within the scope of the agency; (2) in giving instruction No. 21 to the jury over its objection; (3) by submitting the issue of the Estate's negligence under the theory of premises liability to the jury; and (4) in not instructing the jury that the Estate was liable only for the amount of noneconomic damages in direct proportion to its percentage of negligence.

## IV. ANALYSIS

### 1. PUTNAM'S ASSIGNMENTS OF ERROR

#### (a) Denial of Putnam's Motion for Directed Verdict

In reviewing the action of a trial court, an appellate court must treat a motion for a directed verdict as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. Such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from

the evidence. *Radecki v. Mutual of Omaha Ins. Co.*, 255 Neb. 224, 583 N.W.2d 320 (1998). A directed verdict is proper at the close of all the evidence only where reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, where an issue should be decided as a matter of law. *Id.*

### (i) Necessity of Warning

On appeal, Putnam argues that the trial court erred in not granting its motion for a directed verdict because the issue of whether Putnam was strictly liable for failing to attach warnings to its hitch ball should not have been submitted to the jury. Haag responds that Putnam's assignment of error cannot be considered on appeal, because although Putnam made a motion for a directed verdict, it did not state a sufficiently specific basis therefor. Haag contends that, in any event, the evidence regarding the necessity of warnings was in conflict and was sufficient to submit to the jury. For the reasons which follow, we conclude that the trial court correctly denied Putnam's motion for a directed verdict and submitted the issue of the necessity of warnings to the jury.

A motion for a directed verdict should state the specific grounds therefor. See, Neb. Rev. Stat. § 25-1315.01 (Reissue 1995); *Hill v. City of Lincoln*, 249 Neb. 88, 541 N.W.2d 655 (1996). Putnam noted eight specific grounds in support of its motion for directed verdict. In two instances, Putnam referred to the alleged lack of proof regarding Haag's claim of strict liability. In a third specification, Putnam claimed the evidence established that it was not liable, because inter alia, it did not produce an unreasonably dangerous product. The motion for directed verdict was adequate under § 25-1315.01.

To recover against a defendant on a claim of strict liability, a plaintiff must prove by a preponderance of the evidence that (1) the defendant placed the product on the market for use and knew, or in the exercise of reasonable care should have known, that the product would be used without inspection for defects; (2) the product was in a defective condition when it was placed on the market and left the defendant's possession; (3) the defect is the proximate or a proximately contributing cause of the

plaintiff's injury sustained while the product was being used in a way and for the general purpose for which it was designed and intended; (4) the defect, if existent, rendered the product unreasonably dangerous and unsafe for its intended use; and (5) the plaintiff's damages were a direct and proximate result of the alleged defect. *Kudlacek v. Fiat S.p.A.*, 244 Neb. 822, 509 N.W.2d 603 (1994).

In the instant action, Haag's case against Putnam was submitted to the jury on the issue of whether Putnam was strictly liable to Haag for failing to include warnings or instructions with its hitch ball. Specifically, Haag alleged that Putnam should have included the following warnings with its hitch balls: (1) Use the hitch ball only for towing trailers or vehicles connected to the ball with a socket-type coupler that matches the ball size; (2) attach hitch ball to a platform at least three-eighths of an inch thick; mounting hole must not exceed ball shank diameter by more than one-sixteenth of an inch; (3) do not exceed gross trailer weight shown on ball; (4) always use a lockwasher and position it next to nut; (5) threaded shank must protrude beyond bottom of nut when tightened; (6) check nut tightness every time the trailer is hooked up and at the beginning of each towing day; tow only if nut is tightened as specified; (7) replace any damaged or worn part; (8) never attach a towrope, chain, cable, or stretch-type elastic rope to hitch ball or safety chain or other attachment with a ball; and (9) lubricate ball and coupler to minimize wear and friction; coupler must not bind on ball.

Putnam argues on appeal that its hitch balls are not unreasonably dangerous and that no warnings were required. In this regard, Putnam states in its appellate brief that a "hitch ball utilized by farmers in farming communities all across the state is a simple device like that of a bolt or nut which requires no warning at all." Brief for appellant at 12.

Although this court has yet to squarely address this issue, it is generally the law that a product may be defective and unreasonably dangerous because the manufacturer sold the product without sufficient warnings or instructions. The Restatement (Second) of Torts § 402 A, comment *j.* at 353 (1965), states, "In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning . . .

as to its use." See, also, 72 C.J.S. *Products Liability* § 29 (Supp. 1975); 63 Am. Jur. 2d *Products Liability* § 562 (1997).

"Unreasonably dangerous" means that a product has the propensity for causing physical harm beyond that which would be contemplated by the ordinary user or consumer who purchases it, with ordinary knowledge common to the foreseeable class of users as to its characteristics. *Kudlacek v. Fiat S.p.A., supra.* Previously, this court has held that whether a product is unreasonably dangerous is generally a question of fact. *Rahmig v. Mosley Machinery Co.,* 226 Neb. 423, 412 N.W.2d 56 (1987).

In the instant case, there is no serious dispute that not all the threads were engaged, that the hitch ball used was not the proper size for the drawbar, and that a synthetic rope which possessed the ability to store energy was used. The testimony was in conflict as to whether or not those misuses were foreseeable. Haag adduced evidence that the misuses of the hitch ball just described were foreseeable. In particular, Weins testified that the Putnam hitch ball was unreasonably dangerous because Putnam did not warn its consumers against any of the foreseeable misuses set out above. In contrast, Paulsen testified at one point that the misuses of the Putnam hitch ball were the proximate cause of the accident but that these misuses were not reasonably foreseeable to Putnam.

The law with respect to foreseeable misuses has been generally summarized as follows: "When product misuse and its attendant risks are reasonably foreseeable, the manufacturer is in the best position to avoid product-related injuries by giving an adequate warning. Thus, the duty to warn includes a duty to warn with respect to foreseeable misuse of a product." 3 Am. Law Prod. Liab. 3d § 32:48 (rev. 1993). Several jurisdictions follow the rule that the duty to warn includes a duty to warn against foreseeable misuses. See, *Liriano v. Hobart Corp.,* 132 F.3d 124 (2d Cir. 1998); *Ferguson v. F.R. Winkler GMBH & Co. KG,* 79 F.3d 1221 (D.C. Cir. 1996); *Morales v. American Honda Motor Co., Inc.,* 71 F.3d 531 (6th Cir. 1995), *appeal after remand* 151 F.3d 500 (6th Cir. 1998); *Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107 (3d Cir. 1992); *Donahue v. Phillips Petroleum Co.,* 866 F.2d 1008 (8th Cir. 1989); *White v. Amoco Oil Co.,* 835 F.2d 1113 (5th Cir. 1988).

Although the testimony was in conflict regarding the foreseeability of the misuses in this case, because there was sufficient evidence from which a jury could reasonably conclude that the misuses to which the Putnam hitch ball were put were foreseeable, thereby creating a duty to warn against such misuses, the issue of whether a warning was required was properly submitted to the jury. The trial court properly denied Putnam's motion for a directed verdict.

### (ii) Failure to Warn as Proximate Cause

Putnam claims that the trial court erred in failing to grant its motion for a directed verdict on the basis that Haag failed to establish that Putnam's failure to include warnings with its hitch ball was a proximate cause of Haag's injury. Haag responds that he produced expert testimony at trial sufficient to prove that Putnam's failure to warn was the proximate cause of Haag's injuries.

Putnam argues on appeal that assuming warnings were required, Haag nevertheless failed to prove that Putnam's failure to include warnings with its hitch ball was the proximate cause of Haag's injuries. Putnam states that the evidence at trial showed that the persons who installed the hitch balls on the tractors already knew how to properly install the hitch balls. Essentially, Putnam argues that any warnings it might have included with its hitch balls would have been useless.

A review of the record shows that Weins testified at trial regarding Putnam's alleged failure to warn and expressed the opinion that the failure to include warnings or instructions with Putnam hitch balls was the proximate cause of Haag's injuries. On this record, the evidence regarding the utility of warnings and causation due to lack of warnings was sufficient to support Weins' opinion, and the jury was properly permitted to weigh the evidence regarding causation due to failure to warn. See *Carpenter v. Cullan*, 254 Neb. 925, 581 N.W.2d 72 (1998). We conclude that the trial court did not err in denying Putnam's motion for a directed verdict on Putnam's theory that a failure to warn did not proximately cause the accident.

### (b) Limiting Closing Argument

Putnam contends that the record shows that if Putnam had attached warnings to its hitch balls, the installers of these hitch

balls would not have read or heeded the warnings and that its counsel should have been allowed to state in his closing argument to the jury that the record established that warnings would not have been heeded. Haag responds that there is no evidence that warnings would not have been heeded. We conclude that the trial court did not err in connection with its ruling on closing argument.

The general rule is that conduct of final argument is within the discretion of the trial court, and absent an abuse of that discretion, the trial court's ruling regarding final argument will not be disturbed. *Sundeen v. Lehenbauer*, 229 Neb. 727, 428 N.W.2d 629 (1988), citing *State v. Reeves,* 216 Neb. 206, 344 N.W.2d 433 (1984).

In the instant case, no witness testified that warnings, if given, could not be expected to be heeded. Weins testified that he could not opine whether, if given, warnings would be followed. Rex Putnam, the president of Putnam, testified that warnings on hitch balls are to satisfy lawyers. The record does not establish which assistant installed the hitch ball and whether he or she would have obeyed a warning, if any, against misuse. The court is aware that one of the auctioneers, who the evidence shows did not install the hitch balls, testified that he personally would not have read instructions, but that he would have expected the assistants who installed the hitch balls to read the instructions.

The trial court advised Putnam's counsel over objection that Putnam's counsel would not be permitted to state that the evidence showed that warnings would not be heeded. During closing argument, Putnam's counsel referred variously to warnings, including a comment that

> Rex Putnam knew that other manufacturers used warnings, yeah, he did, he told you that. Sure, he made a conscience [sic] decision not to do that because, in his opinion, I think he testified, that the warnings were for the lawyers, and he also testified that many of his competitors did not warn.

There was no evidence presented that warnings could be expected to be ignored, and Putnam's counsel referred in closing argument to the evidence on the topic of warnings such as it

existed in the record, thereby presenting the jury with the issue. The trial court's ruling was not an abuse of discretion.

## 2. ESTATE'S ASSIGNMENTS OF ERROR

### (a) Jury Instructions

In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Tapp v. Blackmore Ranch*, 254 Neb. 40, 575 N.W.2d 341 (1998).

Regarding a claim of prejudice from an instruction given or a court's refusal to give a tendered instruction, the given instructions must be read conjunctively rather than separately in isolation. If the instructions given, which are taken as whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal. *Walkenhorst v. State*, 253 Neb. 986, 573 N.W.2d 474 (1998).

### (i) Instructions Nos. 2 and 15: Agency

The Estate argues that the trial court erroneously instructed the jury that a mere principal-agent relationship between the Estate and Bauer-Moravec was sufficient to create vicarious liability upon the principal, the Estate, for the physical tort of its agent, Bauer-Moravec, acting within the scope of the agency. The Estate argues that one cannot be held vicariously liable for the physical torts of another unless a master-servant relationship is proved and that that requires proof of a right to control. Haag does not specifically address the Estate's argument in his brief. After reviewing the instructions given by the trial court as a whole, we determine there is no reversible error based on the trial court's instructions to the jury on this issue.

The Estate objects to two instructions given by the trial court, instructions Nos. 2 and 15. Instruction No. 2 provided in part:

> Simply stated for the purposes of this trial that theory [of respondeat superior] means that a principal [(the Estate)] is responsible for the negligent acts of its agents (Bauer-Moravec) while they are or were acting within the scope of their employment. Such a claim is based on an agency

concept, which is hereinafter explained to you in separate instructions. If negligence is imputable under this theory, it is referred to as vicarious (the sharing of) liability.

. . . .

With respect to the plaintiff's claim of respondeat superior, the defendant [(the Estate)] has denied that a principal/agent relationship existed in this matter. That defendant claims that the defendants Bauer-Moravec were independent contractors and not agents of [the Estate]. The status of an independent contractor is hereinafter explained to you in a separate instruction.

Instruction No. 15 stated:

It is claimed that at the time of the accident on January 30, 1993, the defendants Bauer-Moravec were acting within the scope of their authority as an agent of [the Estate]. That means that if you find that defendants Bauer-Moravec are liable to the plaintiff, and you determine that an agency relationship existed, then you must also find that [the Estate] is liable to the plaintiff. On the other hand, if you find that the defendants Bauer-Moravec are not liable to the plaintiff, then you must find that [the Estate] is not liable to the plaintiff based on any agency relationship between these parties.

Although the Estate objected to a portion of instruction No. 2 at the instruction conference, it did not object to the portion noted above, nor did the Estate object to instruction No. 15 at trial.

While ordinarily the failure to object to instructions after they have been submitted for review will preclude raising an objection thereafter, a trial judge is nonetheless under a duty to correctly instruct on the law without any request to do so, and an appellate court may take cognizance of plain error and thus set aside a verdict because of a plainly erroneous instruction to which no previous objection was made. *Palmtag v. Gartner Constr. Co.*, 245 Neb. 405, 513 N.W.2d 495 (1994).

In the instant case, the trial court adequately instructed the jury in other instructions that an agency relationship between the Estate and Bauer-Moravec existed only if the Estate consented to Bauer-Moravec's acting on its behalf and if the Estate

had the right to exercise control over Bauer-Moravec, regardless of whether the Estate actually exercised control over Bauer-Moravec. Given that the trial court's instructions taken as a whole correctly state the law and that there was adequate evidence therefor, the instructions were not misleading and adequately covered the issues submissible to the jury and there was no prejudicial error concerning the instructions and necessitating a reversal. Thus, the Estate's argument with respect to instructions Nos. 2 and 15 is without merit.

### (ii) Instruction No. 21: Imputed Negligence

The Estate argues that the trial court committed reversible error in giving instruction No. 21 to the jury over its objection. Instruction No. 21 stated: "The negligence, if any, of the volunteer who placed the hitch ball in question on the tractor in question is imputed to the defendants [(the Estate)] and Bauer-Moravec, and they are liable for the full amount of the damages which were caused by that negligence." The Estate argues that by giving this instruction, the trial court in effect directed a verdict against the Estate, since there was no dispute at trial that an unknown assistant negligently placed the hitch ball on the tractor. The Estate contends that there was no basis on this record for this instruction with respect to the Estate, because the auctioneers were independent contractors and the assistants were servants of the auctioneers, not the Estate. Haag argues that this instruction was correct and that given the Estate's involvement in and significant control of the auction, the negligence of the assistant, if any, was properly imputed to the Estate. As explained below, we conclude that the auctioneers were independent contractors, but given the Estate's substantial control over the independent contractors' work, the Estate was not relieved of its duty to exercise reasonable care in connection with the conduct of the auction and that therefore, instruction No. 21 is supported by the record and was properly given.

### a) Estate's Duty

Generally, the employer of an independent contractor is not liable for physical harm caused to another by the acts or omissions of the contractor or his servants. *Kime v. Hobbs*, 252 Neb. 407, 562 N.W.2d 705 (1997), citing *Anderson v. Nashua Corp.*,

246 Neb. 420, 519 N.W.2d 275 (1994); *Fitzpatrick v. U S West, Inc.*, 246 Neb. 225, 518 N.W.2d 107 (1994). There are two recognized exceptions to the general rule: the employer of an independent contractor may be vicariously liable to a third party (1) if the employer retains control over the contractor's work or (2) if, by rule of law or statute, the employer has a nondelegable duty to protect another from harm caused by the contractor. *Kime v. Hobbs, supra.*

There are 10 factors which are considered in determining whether a person is an employee or an independent contractor: (1) the extent of control which, by the agreement, the employer may exercise over the details of the work; (2) whether the one employed is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the one employed supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the one employed is engaged; (7) the method of payment, whether by the time or by the job; (8) whether the work is part of the regular business of the employer; (9) whether the parties believe they are creating an agency relationship; and (10) whether the employer is or is not in business. *Id.*, citing *Pettit v. State*, 249 Neb. 666, 544 N.W.2d 855 (1996). The right of control is the chief factor distinguishing an employment relationship from one of an independent contractor. *Id.*, citing *Pettit, supra.* In examining the extent of the employer's control over the worker in this context, it is important to distinguish control over the means and methods of the assignment from control over the end product of the work to be performed. *Id.*

Based on the facts of this case, we conclude that the auctioneers served as independent contractors. However, the Estate exercised sufficient control over the auction to subject it to liability, notwithstanding the participation of the auctioneers as independent contractors. The factors which demonstrate the Estate's control include, but are not limited to, the following facts: The auction was held on the Estate's property, and the Estate insisted that the auction be conducted in winter rather

than in summer in a more expansive setting. The Estate was responsible for putting the vehicles in running order but failed to do so, resulting in the necessity of towing the vehicles at the auction. The Estate approved the use of tractors to tow the vehicles at the auction. The Estate approved the use of assistants. The Estate paid the assistants. The Estate insisted that the auction be heavily advertised, resulting in a shoulder-to-shoulder crowd through which the vehicles were to be towed. The Estate and the auctioneers decided to extend the bid barn and charge a $25 fee. Bongers was present at the auction at the time of the accident.

Although actual performance of the task of towing the vehicles was to be performed by the independent contractor auctioneers, the facts in this case as to the Estate's active and considerable control over the activities that led to the accident are sufficient to subject the Estate to liability. In this regard, we note that the Restatement (Second) of Torts § 414 at 387 (1965) provides:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

See, *Kime v. Hobbs, supra*; *Parrish v. Omaha Pub. Power Dist.*, 242 Neb. 783, 496 N.W.2d 902 (1993). We conclude that because the Estate retained considerable control over the relevant work, it is therefore liable for a failure to exercise reasonable care in the use of that control. Accordingly, imputing the negligence of the assistants to the Estate was justified by the facts, and it was not error for the trial court to give instruction No. 21.

### b) Premises Liability

In the instant case, the trial court submitted the issue of the Estate's negligence to the jury on the basis of premises liability. The Estate argues that the court's instruction on this ground was improper, arguing that the auctioneers and not the Estate possessed the land on the date of the sale in order to conduct the

auction and that premises liability does not apply because the accident at issue did not result from a "condition" of the land. Because premises liability encompasses activities conducted on the premises, not merely the condition of the land, we find the Estate's argument to be without merit.

In instruction No. 23, the trial court correctly instructed the jury that the Estate could be liable to Haag under the theory of premises liability if Haag proved four things: (1) The Estate, in carrying on an activity on its premises, failed to use reasonable care for the safety of business visitors; (2) the Estate should have expected that business visitors such as Haag either would not discover or realize the danger or would fail to protect themselves against danger; (3) this failure to use reasonable care was a proximate cause of some damage to Haag; and (4) the nature and extent of that damage. The trial court's instruction was based on NJI2d Civ. 8.23, which is entitled in part, "Damage to Business Visitor—Activities on Premises," in contrast to NJI2d Civ. 8.22, which is entitled in part, "Damage to Business Visitor—Condition of Premises." The instruction at NJI2d Civ. 8.23 follows the Restatement (Second) of Torts § 341 A at 209 (1965), which provides:

A possessor of land is subject to liability to his invitees for physical harm caused to them by his failure to carry on his activities with reasonable care for their safety if, but only if, he should expect that they will not discover or realize the danger, or will fail to protect themselves against it.

The Restatement, *supra*, comment *a.* at 209-10, states in part:

The obligation of the possessor is therefore not limited to one of reasonable care to protect him against conditions of which he does not know or have reason to know, as in the case of the licensee . . . but extends also to protection against the risk of harm from activities of which the invitee knows or has reason to know, where it may reasonably be expected that he will fail to protect himself notwithstanding such knowledge.

Therefore, it is clear that premises liability encompasses not only condition of land, but also activities conducted on the premises.

Additionally, the evidence shows that the Estate remained in possession of the land on the date of the sale, regardless of whether the auctioneers used the property owned by the Estate on which to conduct the auction. See *Plock v. Crossroads Joint Venture*, 239 Neb. 211, 475 N.W.2d 105 (1991) (holding that rule regarding premises liability applies not only to possessor of land, but also to owner in control of premises), *disapproved on other grounds, Welch v. Graves*, 255 Neb. 62, 582 N.W.2d 312 (1998), *overruled on other grounds, Hynes v. Hogan*, 251 Neb. 404, 558 N.W.2d 35 (1997).

Therefore, we conclude that the trial court properly submitted to the jury instruction No. 21, which stated that the negligence, if any, of a volunteer assistant could be imputed to both Bauer-Moravec and the Estate. We conclude that the Estate had a nondelegable duty to keep its premises safe for the auction. The trial court did not err in giving instruction No. 21 to the jury, nor did it err in submitting the Estate's negligence to the jury on the basis of premises liability. Therefore, the Estate's assignment of error regarding instruction No. 21 is without merit.

### (b) Contributory Negligence

The Estate relies in general on Neb. Rev. Stat. § 25-21,185.07 (Reissue 1995) and in particular on Neb. Rev. Stat. § 25-21,185.10 (Reissue 1995) and claims that the trial court erred in not instructing the jury that the Estate was liable only for the amount of noneconomic damages in direct proportion to its percentage of negligence. These statutes pertain to civil actions in which contributory negligence is an affirmative defense. Haag contends that the Estate may not raise this claim on appeal, because the Estate is raising this issue for the first time on appeal. Haag further correctly observes that the Estate did not request an instruction or submit a proposed verdict form on this issue at trial and did not preserve the issue for appeal.

Contributory negligence is an affirmative defense, which must be proved by the party asserting such defense. *Carpender v. Bendorf*, 246 Neb. 77, 516 N.W.2d 619 (1994). An affirmative defense raises new matter which, assuming the allegations in the petition to be true, constitutes a defense to the merits of a

claim asserted in the petition. *Nebraska Pub. Emp. v. City of Omaha*, 244 Neb. 328, 506 N.W.2d 686 (1993). An affirmative defense must be specifically pled to be considered. *Rosberg v. Lingenfelter*, 246 Neb. 85, 516 N.W.2d 625 (1994). An affirmative defense not raised or litigated in the trial court cannot be urged for the first time on appeal. *Sherrod v. State*, 251 Neb. 355, 557 N.W.2d 634 (1997). Thus, we do not address this issue on appeal.

### V. CONCLUSION

After reviewing the record, we conclude that the trial court did not err in denying Putnam's motion for a directed verdict and that the trial court did not abuse its discretion in its ruling with respect to Putnam's closing argument. Additionally, we conclude that the Estate's claimed errors regarding the instructions given by the trial court are without merit. For these reasons, we affirm the orders of the district court.

AFFIRMED.

HENDRY, C.J., and CONNOLLY, J., not participating.