BRENDA L. KELLER, APPELLANT, V.
THOMAS N. TAVARONE, M.D., APPELLEE.
628 N.W. 2d 222

Filed June 22, 2001.    No. S-00-107.

Richard A. DeWitt and Robert S. Lannin, of Croker, Huck, Kasher, DeWitt, Anderson & Gonderinger, P.C., for appellant.

Robert W. Wagoner for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## NATURE OF CASE

The appellant, Brenda L. Keller, sued Thomas N. Tavarone, M.D., for alleged medical malpractice. The district court dismissed Keller's petition after determining that Tavarone was an employee of the Cherry County Hospital (the Hospital) and that Keller had not complied with the claim requirements of the Political Subdivisions Tort Claims Act (Tort Claims Act), Neb. Rev. Stat. ch. 13, art. 9 (Reissue 1997). This case requires that we examine the interaction between the Tort Claims Act and the

Nebraska Hospital-Medical Liability Act (NHMLA), Neb. Rev. Stat. ch. 44, art. 28 (Reissue 1993 & Cum. Supp. 1996).

## PROCEDURAL BACKGROUND

Keller filed a petition in the district court on December 31, 1998. The petition alleged that Tavarone had performed an abdominal hysterectomy on Keller on May 27, 1997, and that complications had ensued, including a fistula and an obstructed ureter. The petition further alleged that Tavarone was negligent in failing to obtain Keller's informed consent to the procedure, in failing to advise Keller of the possible complications, and in failing to consider and follow nonsurgical treatment options. The petition waived review of the claim by a medical review panel pursuant to the NHMLA. See § 44-2840(4). The petition did not allege compliance with the Tort Claims Act. See § 13-920(1).

Tavarone answered and alleged that he was at all relevant times an employee of the Hospital, a county medical facility in Valentine, Nebraska. Tavarone alleged that Keller was admitted to and treated at the Hospital. Tavarone also alleged that no notice of tort claim had been filed with Cherry County. See § 13-905. It was stipulated at trial that Keller was admitted to the Hospital for a hysterectomy and that no notice of tort claim was filed.

The district court ordered a bifurcated trial, with the first part of the proceeding to address whether the Tort Claims Act applied to Keller's claim. Trial was had to the court, and the district court concluded, based on the evidence set forth below, that Tavarone was an employee of the Hospital and that the Hospital was a political subdivision. Accordingly, the district court dismissed Keller's petition for failure to comply with the Tort Claims Act. Keller appeals.

## FACTUAL BACKGROUND

Tavarone graduated from the Creighton University School of Medicine in May 1991 and completed his residency at the University of Medicine and Dentistry of New Jersey in June 1996. Tavarone was hired by the Hospital pursuant to a "Surgeon Employment Agreement," executed on June 3, 1996 (the agreement). The agreement stated that the Hospital wished to recruit Tavarone to relocate to Valentine and to employ Tavarone to

provide full-time medical services. Tavarone's employment was to commence on July 15 and continue indefinitely. The agreement required Tavarone to provide services at the Hospital and its clinic facilities in Valentine, as well as "such other locations as [the Hospital] may reasonably require from time to time."

The agreement provided that Tavarone was to receive a base annual salary paid in 26 equal installments and incentives based on the fees billed by the Hospital for services rendered by Tavarone. The Hospital issued Internal Revenue Service W-2 forms for Tavarone's wages for 1996 to 1998, and Tavarone accordingly filed individual income tax returns for those years showing his wage income from the Hospital. Tavarone was also provided with a signing bonus, moving expenses, and student loan repayment. The Hospital issued Internal Revenue Service 1099 forms for those expenses. The agreement set forth the number of days Tavarone would have for vacation and sick leave, the provision for leave and expenses for continuing medical education, and Tavarone's participation in the Hospital's insurance and retirement plans. The agreement also provided that the Hospital would buy professional liability insurance for Tavarone. Tavarone's application for professional liability insurance listed the Hospital as his employer.

The agreement stated that the Hospital would provide all needed facilities for Tavarone's medical practice. All employees assisting Tavarone were to be employees of the Hospital, "under the administrative and executive control of [the Hospital] and under the technical and medical supervision of [Tavarone]." The agreement provided that all referral and admission decisions were to be made by Tavarone, in the best medical interests of the patients, and that neither the Hospital nor any layperson associated with the Hospital was to have or exercise any control over Tavarone's professional medical judgment in the performance of his duties.

The Hospital was to bill, receive, and retain all fees for professional services rendered by Tavarone during the term of Tavarone's employment by the Hospital. Tavarone was not permitted to engage in the practice of medicine in any other form without the express written permission of the Hospital. The agreement barred Tavarone, if the agreement was terminated,

from soliciting business from his former patients at the Hospital for a period of 6 months following termination. The Hospital was to maintain all medical and clinical records, which were to be the property of the Hospital.

Tavarone testified that he considered himself bound to the Hospital, with no other employment of any nature. Tavarone said that he received his paycheck from the Hospital and that all budgeting and billing for his treatment of patients was performed by the Hospital. Tavarone testified that all of his facilities and equipment were provided by the Hospital with the exception of his cellular telephone.

Tavarone testified that he made all medical decisions regarding patient management, including admission and discharge decisions. Tavarone did not need anyone's permission to perform surgery or use the Hospital operating room. If Tavarone had questions about patient management, he would discuss those with his colleagues, but questions about "business function" were directed to Hospital administrator Brent Petersen. Tavarone stated that he believed general surgery was a part of the business of the Hospital. Tavarone testified that Keller's care took place on Hospital premises and that at the time of Keller's care, Tavarone considered himself to be an employee of the Hospital.

Petersen testified that Tavarone was listed as an employee of the Hospital for payroll and benefit purposes on documentation provided by the Hospital to third parties. Petersen stated that Tavarone was treated like any other employee. Petersen said that he supervised Tavarone on personnel issues and did not personally critique Tavarone's medical judgment, but did have procedures in place and available to ensure that work was being performed and was within acceptable standards of care. Petersen stated that he considered Tavarone to be an employee of the Hospital, and it was stipulated that members of the Hospital's board of trustees would have testified to the same effect.

Petersen testified that the Hospital conducted billings, kept records, and provided all the supplies for Tavarone's care of patients. Petersen also testified that the Hospital paid Tavarone's malpractice insurance premium and NHMLA surcharge. Petersen testified that both Tavarone and the Hospital were covered under the NHMLA.

Petersen stated that other physicians had staff credentials at the Hospital and that three other "independent physicians," or "active staff," practiced in Valentine. Those physicians leased office space from the Hospital in an adjacent building, unlike Tavarone, whose office was part of the Hospital building. Petersen testified that the Hospital had no control over the activities of the independent physicians, other than as a lessor, and with respect to certain hospital policies when the independent physicians were using staff privileges at the Hospital. Petersen stated that the independent physicians performed their own billing.

Keller testified that she was not told that Tavarone was an employee of the Hospital. Keller stated that she did not receive a bill from anyone for Tavarone's services, but that she was covered at the time by medicare or medicaid.

## ASSIGNMENTS OF ERROR

Keller assigns, consolidated and restated, that the district court erred in (1) finding Tavarone to be an employee of the Hospital and (2) concluding that the Tort Claims Act provided the exclusive remedy for Keller's medical malpractice claim.

## STANDARD OF REVIEW

In an action brought pursuant to the Tort Claims Act, or in a bench trial of an action at law, the factual findings by the trial court will not be disturbed on appeal unless they are clearly wrong. See, *Brandon v. County of Richardson*, 261 Neb. 636, 624 N.W.2d 604 (2001); *Desel v. City of Wood River*, 259 Neb. 1040, 614 N.W.2d 313 (2000).

Statutory interpretation presents a question of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *Daniels v. Allstate Indemnity Co.*, 261 Neb. 671, 624 N.W.2d 636 (2001); *Brandon v. County of Richardson, supra.*

## ANALYSIS

### EMPLOYEE/INDEPENDENT CONTRACTOR

It is undisputed on appeal that the Hospital is a governmental entity which is subject to the provisions of the Tort Claims Act. Thus, the initial question is whether Tavarone was an employee

8

of the Hospital. In this regard, Keller argues that the district court erred in finding Tavarone to be an employee of the Hospital, as opposed to an independent contractor.

■ Ordinarily, a party's status as an employee or an independent contractor is a question of fact. However, where the facts are not in dispute and where the inference is clear that there is, or is not, a master and servant relationship, the matter is a question of law. *Reeder v. State*, 254 Neb. 707, 578 N.W.2d 435 (1998); *Kime v. Hobbs*, 252 Neb. 407, 562 N.W.2d 705 (1997). By stating "where the inference is clear," this court means that there can be no dispute as to facts pertaining to the contract and the relationship of the parties involved and only one reasonable inference can be drawn therefrom. *Kime v. Hobbs, supra; Pettit v. State*, 249 Neb. 666, 544 N.W.2d 855 (1996).

■ There is no single test for determining whether one performs services for another as an employee or as an independent contractor, and the following factors must be considered: (1) the extent of control which, by the agreement, the employer may exercise over the details of the work; (2) whether the one employed is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the one employed supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the one employed is engaged; (7) the method of payment, whether by the time or by the job; (8) whether the work is part of the regular business of the employer; (9) whether the parties believe they are creating an agency relationship; and (10) whether the employer is or is not in business. *Reeder v. State, supra; Omaha World-Herald v. Dernier*, 253 Neb. 215, 570 N.W.2d 508 (1997); *Kime v. Hobbs, supra; Pettit v. State, supra.*

■ In considering these factors, Keller relies primarily upon evidence showing that Tavarone's medical decisionmaking was not controlled by the Hospital's administration. Generally, the right of control is the chief factor distinguishing an employment relationship from that of an independent contractor. *Id.*

However, the record shows that while Tavarone was responsible for medical decisions, he was to make those decisions in the best interests of the patients and within established Hospital guidelines. The record also shows that Tavarone was under the control and supervision of the Hospital in most other aspects of his employment. The Hospital maintained all medical and clinical records, which were to be the property of the Hospital. In addition, Tavarone was not permitted to engage in the practice of medicine in any other form without the permission of the Hospital, and Tavarone considered himself bound to the Hospital, with no other employment of any nature. Tavarone's application for professional liability insurance clearly listed the Hospital as his employer. The Hospital also controlled, by agreement, where Tavarone would provide his medical services. Thus, while the record shows that Tavarone had the authority to use his professional medical judgment, this authority was not so unfettered as to demonstrate that the district court was clearly wrong in finding, as a matter of fact, that Tavarone was an employee of the Hospital.

The district court's finding is further supported by the other criteria set forth above. The record does show that Tavarone is engaged in a distinct occupation; that in this locality, that occupation is often performed without supervision; and that Tavarone's occupation is, to say the least, a skilled profession. These factors generally weigh in favor of finding an independent contractor relationship. See *Pettit v. State*, 249 Neb. 666, 544 N.W.2d 855 (1996). However, the record also shows that the Hospital provided all the facilities and supplies for Tavarone's employment and performed all the billing and administrative functions. All employees assisting Tavarone were also employees of the Hospital. The record establishes that Tavarone was engaged to work for an indefinite period of time, during which he would be paid a fixed salary, albeit with incentives. These factors are suggestive of an employment relationship. See *Omaha World-Herald v. Dernier, supra*. The record also indicates, by the terms of the agreement and from their own testimony, that the parties to the agreement believed they had created an agency relationship. Whether the parties believed that

they were creating a master-servant relationship is an important guideline in determining the legal nature of the relationship. *Id.*

The record also shows that the Hospital is in business and that the work performed by Tavarone was a part of the regular business of the Hospital. Keller concedes that the Hospital is in business, but argues briefly that the Hospital is not in the business of practicing medicine and surgery, because medicine and surgery can be practiced only by licensed professionals. This argument taken to its logical conclusion would mean that no physician could ever be an employee. Keller's argument is similar to one rejected by this court in *Omaha World-Herald v. Dernier*, 253 Neb. 215, 570 N.W.2d 508 (1997). In that case, the question was whether an individual who purchased and resold daily newspapers was an employee of the newspaper publisher. The publisher argued that it was in the business of publishing, but not selling, newspapers. We rejected that argument, concluding that the sale of newspapers was clearly an "integral part" of the business in which the publisher was engaged. *Id.* at 228, 570 N.W.2d at 517.

Similarly, the provision of medical services, through its appropriately licensed employees, is clearly an "integral part" of the business of the Hospital. Indeed, Keller does not address what, if anything, the business of the Hospital could be, if not the provision of medical and surgical health care services. Tavarone's work is an evident part of the regular business of the Hospital; this is further indication of an employment relationship. See *id.*

In sum, while there is some evidence regarding Tavarone's professional status and decisionmaking regarding medical issues that could weigh in favor of an independent contractor status, there is also substantial evidence of the Hospital's control over Tavarone's practice and other factors that support the district court's finding that Tavarone was an employee of the Hospital. Given the reasonable inferences that can be drawn from the record, this was a question of fact for the district court to determine, and the district court's determination was not clearly wrong.

### Tort Claims Act/NHMLA

Since Tavarone was found to be an employee of a political subdivision, and it is not disputed that Keller's alleged cause of

action arose within the scope of Tavarone's employment by the Hospital, Keller's claim falls subject to the provisions of § 13-920(1), which provides:

No suit shall be commenced against any employee of a political subdivision for money on account of damage to or loss of property or personal injury to or the death of any person caused by any negligent or wrongful act or omission of the employee while acting in the scope of his or her office or employment occurring after May 13, 1987, unless a claim has been submitted in writing to the governing body of the political subdivision within one year after such claim accrued in accordance with section 13-905.

While not a jurisdictional prerequisite, the filing or presentment of a claim to the appropriate political subdivision is a condition precedent to commencement of a suit under the Tort Claims Act. See, *Millman v. County of Butler*, 235 Neb. 915, 458 N.W.2d 207 (1990); *Knight v. Hays*, 4 Neb. App. 388, 544 N.W.2d 106 (1996). The Tort Claims Act is the exclusive means by which a tort claim may be maintained against a political subdivision or its employees. See § 13-902. Keller stipulated that at the time of trial, she had not presented or filed a claim pursuant to § 13-905.

Keller argues, however, that because her action was brought pursuant to the NHMLA, she was not required to comply with the Tort Claims Act. It is not disputed that both Tavarone and the Hospital were qualified health care providers within the meaning of the NHMLA. Section 44-2821(2) provides, in relevant part:

If a health care provider shall qualify under the act, the patient's exclusive remedy against the health care provider . . . for alleged malpractice, professional negligence, failure to provide care, breach of contract relating to providing medical care, or other claim based upon failure to obtain informed consent for an operation or treatment shall be as provided by the act unless the patient shall have elected not to come under the provisions of the act.

Section 44-2840 further states, in relevant part:

(1) Provision is hereby made for the establishment of medical review panels to review all malpractice claims against health care providers covered by the Nebraska

Hospital-Medical Liability Act in advance of filing such actions.

(2) No action against a health care provider may be commenced in any court of this state before the claimant's proposed petition has been presented to a medical review panel established pursuant to section 44-2841 and an opinion has been rendered by the panel.

. . . .

(4) The claimant may affirmatively waive his or her right to a panel review, and in such case the claimant may proceed to file his or her action directly in court.

Keller argues that the NHMLA purports to be an exclusive remedy for medical malpractice claims and, thus, that although she waived a panel review under § 44-2840(4), her action pursuant to the NHMLA still did not need to comply with the requirements of any other act, including the Tort Claims Act.

■ The first problem with Keller's argument is that the Tort Claims Act is not simply a statutory remedy, but is also a waiver of sovereign immunity. The NHMLA, on the other hand, provides no explicit waiver of sovereign immunity. Statutes that purport to waive the State's sovereign immunity must be clear in their intent, and are strictly construed in favor of the sovereign and against the waiver. See, *King v. State*, 260 Neb. 14, 614 N.W.2d 341 (2000); *Woollen v. State*, 256 Neb. 865, 593 N.W.2d 729 (1999). The NHMLA contains no waiver of sovereign immunity that would permit its application as a remedy against the State or a political subdivision of the State.

More significant, however, is that the Tort Claims Act provides, in no uncertain terms, for interaction between the Tort Claims Act and the NHMLA. Section 13-919(4) provides:

If a claim is brought under the Nebraska Hospital-Medical Liability Act, the filing of a request for review under section 44-2840 shall extend the time to begin suit under the Political Subdivisions Tort Claims Act an additional ninety days following the issuance of the opinion by the medical review panel if the time to begin suit under the Political Subdivisions Tort Claims Act would otherwise expire before the end of such ninety-day period.

This section clearly contemplates that litigants would be required to comply with both the NHMLA and the Tort Claims Act. The legislative history of this provision, and its analog in the Tort Claims Act, Neb. Rev. Stat. § 81-8,227(3) (Reissue 1996), reveals that the intent of this provision was to harmonize the requirements of the Tort Claims Act and the NHMLA. As stated by the senator introducing the legislation:

> Section 3 is intended to eliminate a procedural trap which has bothered plaintiff's lawyers that have claims for professional negligence against public hospitals which have qualified under the act. There are two sets of statutes which affect these claims, the Tort Claims laws and the Hospital-Medical Liability Act. Under current law if you file a claim against a hospital run by a county, for example, and the claim is denied by the county board, it must then be submitted to the medical review panel before lawsuit may be filed. Because of the time limitations in the Tort Claims Acts [sic], there can be problems if the medical review panel procedure is delayed. Part of the problem has already been solved by [this bill] because it makes the review panels optional. However, there may be situations where persons claiming against public hospitals want to use medical review panels. In those situations these amendments provide that the request for the medical review panel will toll or delay the applicable section of the Tort Claims Act. While the panel procedure is pending, the claimant will have 90 days after the panel is completed to file suit if the limitations period is expired.

Floor Debate, L.B. 692, 88th Leg., 2d Sess. 9331-32 (Mar. 9, 1984). See, also, Banking Committee Hearing, L.B. 692, 88th Leg., 2d Sess. (Jan. 16, 1984).

Keller argues that § 13-919(4) does not apply in this case, because it only extends the time for filing suit after a panel review under the NHMLA, while Keller expressly waived a panel review. Keller's observation is correct, but beside the point. Section 13-919(4) evinces the Legislature's intent to harmonize the operation of the two acts in question and, thus, contradicts Keller's claim that the acts operate exclusive of one another.

In the first place, if Keller's argument about the exclusivity of the NHMLA was correct, then § 13-919(4) would have been unnecessary. Section 13-919(4) extends the time for filing suit under the Tort Claims Act after the completion of a panel review under the NHMLA. If a suit pursuant to the NHMLA excused a litigant from the requirements of the Tort Claims Act, then the extension provided by § 13-919(4) would not have been needed. Instead, the Legislature amended the statute to harmonize the NHMLA and the Tort Claims Act, signaling its intent that both the NHMLA and the Tort Claims Act were to apply to medical malpractice claims against qualifying political subdivisions.

In the absence of clear legislative intent, the construction of a statute will not be adopted which has the effect of nullifying another statute. See, *Bergan Mercy Health Sys. v. Haven*, 260 Neb. 846, 620 N.W.2d 339 (2000); *In re Invol. Dissolution of Battle Creek State Bank*, 254 Neb. 120, 575 N.W.2d 356 (1998). Here, Keller asks us to adopt a construction of the NHMLA that would nullify provisions of the Tort Claims Act, despite evidence of clear legislative intent to the contrary. Keller's construction of the statute would also require us to disregard the Legislature's purpose in amending the Tort Claims Act—to harmonize its provisions with those of the NHMLA. However, in construing a statute, a court must look to the statute's purpose and give to the statute a reasonable construction which best achieves that purpose, rather than a construction which would defeat it. *In re Invol. Dissolution of Battle Creek State Bank, supra.*

In this instance, a reasonable construction of the statute is apparent in the statutory scheme contemplated by the Legislature, which is reflected in the legislative history and the language of the statute. The Tort Claims Act requires that a claim must be submitted to a political subdivision within 1 year after such claim accrued, and no suit will be permitted under the Tort Claims Act until the political subdivision makes final disposition of the claim, except that a claimant may withdraw the claim and bring suit if the political subdivision does not make final disposition of the claim within 6 months after the claim is filed. See, § 13-906; § 13-919(1). In short, a litigant must first file a claim, and then may bring suit only after the claim is disposed of or withdrawn.

The language of § 13-919(4) specifically provides an extension for the time to "begin suit" under the Tort Claims Act—not the time to file a claim. The statutory language contemplates that a claim under the Tort Claims Act must be filed and disposed of or withdrawn prior to presentation of the proposed petition to a medical review panel, or the waiver of a medical review panel, under § 44-2840.

In other words, the procedure the statutes required Keller to follow was, first, to file a claim with the appropriate officer of the political subdivision, pursuant to § 13-905, within 1 year of the accrual of her claim. After the claim was disposed of or withdrawn, pursuant to § 13-906, Keller would have been permitted to either submit a proposed petition to a review panel, or waive such review, pursuant to § 44-2840(3) and (4). If she had presented the petition to a review panel, she would have had an extra 90 days, after the issuance of the opinion of the review panel, to file suit under the Tort Claims Act. See § 13-919(4). If she had waived the panel review, the action under the Tort Claims Act would have been filed directly in the district court. See, § 44-2840(4); § 13-907.

The operation of the NHMLA, however, did not excuse Keller from compliance with the requirement under the Tort Claims Act that the claim be presented to the political subdivision prior to filing suit. As Keller concedes that no claim was filed with the political subdivision prior to filing suit, her petition was properly dismissed pursuant to § 13-920(1). Keller's assignment of error to the contrary is without merit.

### TORT CLAIMS ACT SAVINGS CLAUSE

Keller argues that even if she was subject to the presentment requirement of the Tort Claims Act, the district court erred in not maintaining her petition pursuant to the "savings clause" contained in § 13-919(2). Brief for appellant at 30. That section provides, in relevant part:

> If a claim is made or filed under any other law of this state and a determination is made by a political subdivision or court that the act provides the exclusive remedy for the claim, the time to make a claim and to begin suit under the act shall be extended for a period of six months from the

date of the court order making such determination or the date of mailing of notice to the claimant of such determination by the political subdivision if the time to make the claim and to begin suit under the act would otherwise expire before the end of such period.

Keller argues that she filed a "claim" under "any other law of this state," i.e., filed suit under the NHMLA, and that the time for her to make a claim under the Tort Claims Act should be extended. This argument, however, was not properly before the district court and is not properly before this court. Even assuming, without deciding, that § 13-919(2) would apply under the circumstances of Keller's case to extend the time for her to file a claim pursuant to § 13-905, the record before this court does not show whether such a claim has in fact been filed.

■ In other words, while an argument could be made that § 13-919(2) potentially provides an extension of time to permit the filing of an otherwise untimely claim, there is no indication in the instant record that a claim, untimely or otherwise, has been filed at all. Keller's argument is, at best, premature. Because § 13-919(2) is not implicated by the record in this case, we do not opine on whether Keller's suit under the NHMLA would constitute a claim "made or filed under any other law of this state," or whether § 13-919(2) would otherwise be applicable. In the absence of an actual case or controversy requiring judicial resolution, it is not the function of the courts to render a judgment that is merely advisory. *US Ecology v. State*, 258 Neb. 10, 601 N.W.2d 775 (1999).

## CONCLUSION

For the foregoing reasons, we conclude that the district court did not err in determining that Tavarone was an employee of a political subdivision and that Keller's suit was barred by her failure to comply with the provisions of the Tort Claims Act. We, therefore, affirm the judgment of the district court.

AFFIRMED.