RANDY REEDER, APPELLANT, V.
STATE OF NEBRASKA, APPELLEE.

Filed May 13, 2002.    No. A-00-1121.

This opinion has been ordered permanently published by order
of the Court of Appeals dated June 19, 2002.

649 N.W.2d 504

Vince Powers, of Vince Powers & Associates, and, on brief, Denzel Rex Busick, for appellant.

Don Stenberg, Attorney General, and Royce N. Harper for appellee.

Sievers, Carlson, and Moore, Judges.

Sievers, Judge.

Randy Reeder, a disabled individual, appeals the Hall County District Court's finding that a provider of nursing services who is paid by Medicaid funds distributed by Nebraska's Department of Health and Human Services (DHHS) is an independent contractor rather than a DHHS employee. Reeder, who suffered a recurrence of decubitus ulcers on his heels while the nurse provider cared for him argues that DHHS is vicariously liable for the alleged negligence of the nurse in treating the ulcers.

## I. FACTUAL BACKGROUND

Reeder was paralyzed from the neck down and left with only limited use of his arms as a result of a car accident on May 5, 1990. He was released from the hospital on March 4, 1991, but due to his disability, Reeder required home health care. He qualified for the Aged and Disabled Medical Waiver program, a state and federally funded program administered by Nebraska's Department of Social Services, now known as DHHS. Individuals

qualifying for this assistance program are referred to as "clients" of DHHS but choose their own service providers. A service provider may be a chore provider, an untrained or trained personal care aide (PCA), a licensed practical nurse (LPN), or a registered nurse (RN). A PCA helps the client complete the daily tasks of living, such as bathing, grooming, and dressing; cleans the client's immediate living space; and transports the client to doctor appointments. If DHHS receives an order from the client's primary physician, an LPN or RN may function as a service provider. 471 Neb. Admin. Code, ch. 13, § 002.02 (1998). Beyond obtaining the physician's order for private-duty nursing services, DHHS must authorize the number of hours to be worked based on the physician's order and the client's medical need. 471 Neb. Admin. Code, ch. 13, § 003.01 (1998). The regulations also specify billing and payment procedures.

One of Reeder's physicians, a Dr. McCammond, submitted an order stating that Reeder required the services of an LPN 1 to 2 hours daily and a PCA 4 to 5 hours daily. Reeder's home health nurse from Saint Francis Medical Center in Grand Island told him that Shari Perales had contacted DHHS for employment and that she was an LPN. Reeder met with Perales and notified DHHS in March 1991 that he had selected her to provide the LPN and PCA services he required. Dorelle Wilson, a DHHS caseworker, checked Perales' credentials, obtained references, and ran a background check. Perales signed two "Medical Assistance Provider Agreements," one allowing her to function as a trained PCA—due to her LPN licensing—and another to serve as an LPN. Both forms required her to follow DHHS policies and procedures in order to receive pay for approved services. The forms also required Perales to swear that she would keep accurate records of the services she provided and that she would provide all services to Reeder that she reported to DHHS for payment. Perales was given a DHHS manual describing the services covered by the program and a care plan—created by Wilson, Reeder, and Perales—that listed the types and frequency of PCA and LPN services Reeder needed.

Perales was reimbursed for her services to Reeder by DHHS on an hourly basis, earning a higher rate of pay for her LPN tasks than for her trained PCA tasks. DHHS never withheld income

taxes from her paychecks, but Perales' 1994 W-2 form shows that her Social Security taxes were paid by DHHS, at least in that year of Perales' service to Reeder. The W-2 form lists DHHS in the box where Perales' employer is identified, but that box also includes "EMPL REEDER RANDY H." Beyond following the care plan, Reeder and Perales decided the details of their work relationship, including the scheduling of Perales' performance of her duties, and Reeder verified the hours Perales worked before she submitted her timesheets to DHHS. If Perales needed to work more hours than authorized, she obtained Wilson's approval, but neither Wilson nor DHHS directed Perales' performance of her duties nor suggested medical treatment.

Perales' nursing duties encompassed Reeder's catheter care, suprapubic care, and bowel program. In May 1991, Reeder re-developed decubitus ulcers on his heels which he first suffered and recovered from in 1990 after his accident. Although the DHHS manual directs providers to notify the primary or prescribing physician if medical problems arise, Reeder and Perales jointly decided to take Reeder to a podiatrist Perales had once seen for treatment, rather than to one of the physicians that Reeder had previously seen or his attending physician, identified on his initial care plan as Dr. McCammond. Perales notified Wilson that Reeder had been seen by a podiatrist and that she followed the podiatrist's orders in caring for Reeder. The severity and deterioration of Reeder's condition was not known until Perales asked the home health care nurse from St. Francis to look at his heels. As a result, Reeder immediately returned to the care of the doctor in Omaha who had previously treated his heels. Reeder had skin grafting and a long period of recuperation, but the ulcers never healed properly. He suffered a further loss of independence and mobility because the 2-hour daily treatment of his ulcers required the assistance of a nurse. Reeder's emotional health was adversely affected, he attempted suicide in June 1998, and he may need to have his feet amputated if infection reappears. Despite Reeder's filing of suit against DHHS in December 1993, Perales continued to work for him until May 1999.

## II. PROCEDURAL BACKGROUND

Reeder filed suit in the Hall County District Court against DHHS, pursuant to the State Tort Claims Act, alleging that DHHS

was negligent in failing to give appropriate instructions and training to the nurse whom DHHS approved for his care and that DHHS failed to exercise reasonable care in supplying and providing nursing services to him.

DHHS moved for summary judgment, and the district court held as a matter of law that no employment relationship existed between DHHS and Perales. Reeder appealed, and the Supreme Court found that the district court erred by holding as a matter of law that Perales was not a DHHS employee. It reversed and remanded the matter to the district court for trial to determine whether the evidence showed Perales to be a DHHS employee or an independent contractor. *Reeder v. State*, 254 Neb. 707, 578 N.W.2d 435 (1998) (*Reeder I*).

On October 27 and 28, 1999, the district court held another hearing on this matter. Depositions taken several years earlier from Wilson and Paula Greenfield, Wilson's supervisor, were admitted into evidence. Wilson testified that she was not required as a DHHS caseworker to possess medical training. She further testified that she viewed DHHS as the "payment vessel" and the client as the provider's employer. Greenfield concurred with Wilson, characterizing DHHS' role as "an agent for monitoring and payment." She also testified that she specifically informs providers they are not DHHS employees, pointing out that they are not eligible for employment benefits such as overtime, holiday, or sick pay. Greenfield said that DHHS does not monitor the care a provider gives a client but investigates if it becomes aware that the provider is placing the health or safety of a client in jeopardy. She added that the client makes the decision whether to fire a provider, but DHHS may overrule a client's decision to retain a provider if the provider is abusing or stealing from the client. Greenfield testified that DHHS is not directly involved with the medical care provided clients and that if any medical problems arise, the providers are instructed to contact the client's primary care physician.

Nancy Olson, unit manager for long-term-care services in the Medicaid program, testified at trial that LPNs perform their duties under the direct supervision of a doctor or RN. She explained that LPNs receive a year of training before they sit for "boards" and become licensed by the State. Olson described

LPNs as "independent providers the same as physicians, dentists, hospitals." Perales testified that she considered Wilson to be her supervisor, that she and Wilson regularly spoke about Reeder's condition, and that Wilson visited Reeder a couple of times. But Perales also stated that DHHS never provided her with the necessary tools or workplace to care for Reeder, that Wilson never directed Perales' medical treatment of him, that she received no medical training or employment benefits from DHHS, and that DHHS viewed Perales as an independent contractor.

The district court concluded that Perales' relationship to DHHS was such that there could be no vicarious liability and that it need not address the issues of negligence and causation presented by the evidence. From that finding, Reeder appealed to this court.

### III. ASSIGNMENTS OF ERROR

Reeder assigns error to the trial court's (1) ruling that the nurse provider caring for him was an independent contractor rather than a DHHS employee; (2) failing to find DHHS vicariously liable by virtue of the control it exercised over the nurse provider, regardless of her employment status; and (3) not addressing the issues of negligence and proximate cause.

### IV. STANDARD OF REVIEW

In a bench trial of a law action, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly erroneous. *Phipps v. Skyview Farms, Inc.*, 259 Neb. 492, 610 N.W.2d 723 (2000). The appellate court does not reweigh the evidence but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Id.*

### V. ANALYSIS

#### 1. PERALES' STATUS: QUESTION OF FACT OR QUESTION OF LAW

Reeder argues that the district court erred, as a matter of law, by concluding that Perales was an independent contractor when the documentary evidence from DHHS on its right to control Perales' activities was "essentially uncontradicted at trial." He

contends that DHHS exercised such control over Perales' performance of services for Reeder that a master-servant relationship between DHHS and Perales was formed. Reeder alleges that where the facts are not in dispute and where the inference is clear that there is, or is not, a master and servant relationship, the matter is a question of law. *Reeder v. State*, 254 Neb. 707, 578 N.W.2d 435 (1998); *Kime v. Hobbs*, 252 Neb. 407, 562 N.W.2d 705 (1997).

■ Reeder's argument appears to be that this court should review the district court's decision by treating the issue of Perales' status as a question of law requiring us to reach a conclusion independent of the district court's ruling. See *Hemmerling v. Happy Cab Co.*, 247 Neb. 919, 530 N.W.2d 916 (1995) (contractual agreement placed right of control over taxicab in Happy Cab and company in fact exercised extensive control over cab and its driver, making, as matter of law, driver Happy Cab employee). But ordinarily, a person's status as an employee or an independent contractor is a question of fact, *Reeder v. State, supra*, and *Kime v. Hobbs, supra*, because there is rarely a definitive contract on the matter as there was in *Hemmerling*. Here, unlike in *Hemmerling*, there is an issue as to the extent of control DHHS exercised over Perales and there is no contract which clearly establishes DHHS' control over Perales' nursing services to Reeder. Thus, *Hemmerling* is distinguishable, and Perales' status is a question of fact, not a question of law. Under our standard of review, we do not reweigh the evidence but consider the trial court's decision in the light most favorable to DHHS and resolve evidentiary conflicts in favor of DHHS. See *Phipps v. Skyview Farms, Inc., supra*.

## 2. PERALES' STATUS: INDEPENDENT CONTRACTOR OR DHHS EMPLOYEE

■ The law governing analysis of the nature of Perales' and DHHS' legal relationship is well established and is set forth in a number of recent cases considering 10 factors:

"(1) the extent of control which, by the agreement, the employer may exercise over the details of the work, (2) whether the one employed is engaged in a distinct occupation or business, (3) the kind of occupation, with reference

to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision, (4) the skill required in the particular occupation, (5) whether the employer or the one employed supplies the instrumentalities, tools, and the place of work for the person doing the work, (6) the length of time for which the one employed is engaged, (7) the method of payment, whether by the time or by the job, (8) whether the work is part of the regular business of the employer, (9) whether the parties believe they are creating an agency relationship, and (10) whether the employer is or is not in business."

*Hemmerling v. Happy Cab Co.*, 247 Neb. at 929, 530 N.W.2d at 922.

After considering all 10 factors, the district court concluded that there was no "vicarious relationship" between Perales and DHHS, which is simply another way of saying that no employer-employee relationship existed. Reeder argues that the 10 factors applied to the facts show that Perales' nursing activities on Reeder's behalf made her a DHHS employee rather than an independent contractor. We observe that although Perales also functioned as a PCA for Reeder, signed separate Medical Assistance Provider Agreements, and was paid at different rates depending on whether she completed tasks as an LPN or as a PCA, the trial court did not separately analyze her status as a PCA. Nonetheless, Reeder's allegations of negligence, as well as his assignments of error and arguments, focus exclusively on the tasks that Perales completed for Reeder in her capacity as an LPN rather than as a PCA. Accordingly, it is proper to confine our analysis and review of her status to her work as an LPN.

An independent contractor is one who, in the course of an independent occupation or employment, undertakes work subject to the will or control of the person for whom the work is done only as to the result of the work and not as to the methods or means used. *Id.*; *Reeder v. State*, 254 Neb. 707, 578 N.W.2d 435 (1998). There is no single test for determining whether one performs services as an employee or an independent contractor. *Id.* We now turn to the 10 factors to determine if the district court's determination that Perales was not a DHHS employee is clearly wrong.

### (a) Control

Generally, the right of control is the chief factor distinguishing an employee from an independent contractor. *Keller v. Tavarone,* 262 Neb. 2, 628 N.W.2d 222 (2001); *Pettit v. State,* 249 Neb. 666, 544 N.W.2d 855 (1996). Reeder asserts that DHHS had the right and power under its agreement with Perales to control virtually all the details of her work if it so chose, and Perales was not given contractual discretion to deviate from DHHS policies or procedures set forth in the manual given to her. Reeder notes that the Supreme Court gave great weight to a cab company's contractual right to control an alleged employee through its policies and procedures in *Hemmerling v. Happy Cab Co.,* 247 Neb. 919, 530 N.W.2d 916 (1995). But in *Hemmerling,* the cab company exerted control over the means and methods Hemmerling used in operating a taxicab as evidenced by the contents of a written equipment lease agreement which controlled the cab's use.

Here, the Medical Assistance Provider Agreements Perales signed did not dictate how she would provide medical care to Reeder. For example, they do not spell out how an LPN shall do a bowel program with a paralyzed person—that is within Perales' expertise and discretion. Even though Perales kept Wilson apprised of Reeder's condition and received advice from Wilson as to how to deal with Reeder's "moodiness," that does not equate to the contractual control found in *Hemmerling.* Indeed, DHHS' manual instructed Perales to contact the client's attending physician should medical problems arise, not DHHS.

Reeder notes that the Supreme Court has found that a "training manual" from an employer may provide evidence of such control over a hired individual to suggest the creation of an employment relationship. See *Larson v. Hometown Communications, Inc.,* 248 Neb. 942, 540 N.W.2d 339 (1995). Compare *Omaha World-Herald v. Dernier,* 253 Neb. 215, 570 N.W.2d 508 (1997) (lack of comprehensive handbooks, policies, or guidelines defining manner in which distributor was to perform specific tasks suggests newspaper did not control distributor). The DHHS manual detailed services which are covered by the Aged and Disabled Medicaid Waiver Program and instructed a provider as to how to submit claims for reimbursement. The manual did not direct the provider as to how to provide medical

services to a client. The manual is largely designed to ensure proper payment only for covered services. " ' "[E]ven the employer of an independent contractor may, without changing the status, exercise such control as is necessary to [en]sure performance of the contract in accordance with its terms." ' " *Id.* at 223, 570 N.W.2d at 514, quoting *Larson, supra.*

The district court correctly noted that DHHS does not oversee or direct the services a provider performs for a client because the physician's order determines the nature and extent of services. The court noted that documents that were taken from the DHHS manual referencing nursing services establish the types of services and allowable fees reimbursed through DHHS but do not direct the manner in which medical services are provided to clients. Further, the court noted that the Medical Assistance Provider Agreements Perales signed as a trained PCA and LPN, requiring her to promise to follow DHHS policies and procedures, reference billing procedures rather than direct treatment decisions, save for instructing providers to contact a client's primary physician should medical problems arise. The district court found that DHHS acts as a steward of federal moneys by predetermining the reasonable length of services, serves as a conduit to pay providers, and is responsible for ensuring that services are appropriately provided to clients. Thus, the court concluded that by agreement, DHHS' control over Perales' work was limited to administrative duties and "the collateral effects of that administration on the professional services." By this finding, the district court concluded that DHHS did not control Perales' work to the extent that an employment relationship was clearly created. The evidence supports the district court's conclusion, and its finding on what is often the crucial factor in the analysis was not clearly wrong.

### (b) Distinct Occupation

Reeder argues that Perales had to have been supervised by someone, be it a physician or an employer such as DHHS, and that her frequent contact with Wilson and her need for Wilson's approval to work more hours for Reeder show that she was a DHHS employee. But this argument misses the point of this factor. "Distinct" refers to whether Perales offered a service similar

to that she offered to DHHS or to other people or entities. See, *Pettit v. State*, 249 Neb. 666, 544 N.W.2d 855 (1996); *Larson v. Hometown Communications, Inc., supra.* Although it acknowledged that Perales was hired to provide part-time professional nursing services for Reeder and that she was not prohibited from pursuing other employment, the district court found that the evidence does not suggest whether LPNs are customarily hired as independent contractors or full-time employees. The court's conclusion on this factor was that it was "problematic"—which we interpret to mean that the evidence on this point does not point to one status rather than the other. Our review of the evidence reveals that the district court's conclusion was not clearly wrong.

(c) Whether Work Done Under Employer's Supervision
or by Specialist Without Supervision in That Locality

Reeder argues that it is reasonable for a nurse provider to assume that because DHHS submits a doctor's order to the nurse and approves the number of hours necessary to complete tasks for the client that DHHS is supervising the nurse's performance. As in *Pettit v. State, supra*, Perales' completion of her duties was not directly supervised by DHHS but was actually supervised by her client, Reeder. The district court found that although DHHS provided "nonprofessional supervision" of Perales, "professional supervision" was the responsibility of other medical professionals. We agree, as the evidence clearly shows that nurse providers are under the medical supervision of the attending or prescribing physician, not DHHS, in caring for a client's medical needs. With respect to this factor, the evidence supports the court's conclusion that Perales was not an employee.

(d) Skill Required in Particular Occupation

Reeder concedes that nursing is a skilled occupation. See *Pettit v. State, supra* (DHHS chore provider with specialized training and respite care certificate was a skilled provider). A logical extension of *Pettit* is that an LPN would also be a skilled provider. But Reeder argues that DHHS' control of a nursing provider's payment, evident from its scrutinizing of the nurse's timesheets to ensure that the provider does not offer services unauthorized by a physician's order, limits the discretion and

autonomy of the nurse provider. Thus, Reeder concludes, a master-servant relationship between DHHS and Perales was created. We think that Reeder misconstrues the import of that evidence. The district court found that the manner in which Perales completed her nursing duties was not controlled by DHHS. Because DHHS ensures that payment is not made for services which are outside a doctor's orders does not change the fact that Perales is working as a skilled provider, and that fact tends to suggest that she is an independent contractor.

### (e) Who Supplies Instrumentalities, Tools, and Workplace

Reeder asserts that Perales was not required to buy medical supplies from her own funds and that they were presumably paid for by Medicaid funds. He further asserts that by virtue of "assigning" Perales to work for Reeder, DHHS provided Perales the place to work. The district court made no specific finding concerning this factor, but merely recited the evidence. Therefore, our task is to look at the evidence, which the trial court correctly recounted on this factor, from the standpoint of whether it shows that the district court's final conclusion was clearly wrong, even if the trial court's reasoning was incorrect. See *Phipps v. Skyview Farms, Inc.*, 259 Neb. 492, 610 N.W.2d 723 (2000).

As the district court noted, Reeder provided the medical supplies, although they may have been purchased using Medicaid funds, and Perales performed her work in Reeder's home, but that is simply a fact inherent in home nursing care. Working in Reeder's home did not create an employment relationship between DHHS and Perales because Reeder's injury and the nature of the work required Perales to perform her duties there. As for the medical supplies, in *Pettit v. State, supra*, it was noted that the DHHS manual made it the chore provider's responsibility to supply necessary tools if not provided by a client, which implies that the chore provider was an independent contractor. Here, the nature of the medical supplies are such that generally they would be provided by Reeder, rather than by DHHS or his nurse provider. We find that although the district court did not reach any conclusion as to the impact the evidence of this factor

had on determining Perales' status, our review of the record on this factor leads us to the conclusion that the court's recitation of the evidence was accurate, and nothing in such evidence makes the court's ultimate conclusion that Perales was an independent contractor clear error.

(f) Length of Time for Which One Employed Is Engaged

Reeder argues the indefinite length of his working relationship with Perales—spanning 8 years—together with other factors show an employment relationship between DHHS and Perales. The district court found that although Perales worked with Reeder over a considerable period of time, the permanency of her service was not initially contemplated and was subject to periodic evaluation by DHHS. Although once again the court reached no conclusion as to what its factual findings meant, we proceed in the same fashion as we did with the previous factor.

Given the evidence, we think this factor is equivocal. But, because it is equivocal, it is clear that the evidence on this factor is not such that it makes the district court's ultimate conclusion clearly wrong. In saying this, we note that the record shows that a paralyzed individual's physical condition is not expected to change markedly and the nursing services that Perales provided were services that Reeder would likely always need. An ongoing relationship not limited to a specific duration or task is suggestive of an employment relationship. See *Omaha World-Herald v. Dernier*, 253 Neb. 215, 570 N.W.2d 508 (1997). But here, Perales had the singular task of providing the in-home care that Reeder needed in the past and would likely require over his lifetime. She was not doing whatever an employer told her to do, she was providing a specific service that Reeder will likely need the rest of his life. These facts are hardly strongly suggestive of an employer-employee relationship between DHHS and Perales.

(g) Method of Payment: by Time or by Job

Reeder contends that Perales was paid by the hour and that this method of payment, along with DHHS' monitoring of her timesheets, suggests she is a DHHS employee. The district court found that although payment of Perales on an hourly basis suggested an employment relationship between her and DHHS, the

per hour wage was part of a formula by which maximum compensation for a particular task was established. As a result, Perales' payment for any given task could be reduced if DHHS determined that fewer hours than she reported were necessary to complete the task.

The payment of wages, specifically limited wages, argues for an employment relationship. See, *Pettit v. State,* 249 Neb. 666, 544 N.W.2d 855 (1996); *Hemmerling v. Happy Cab Co.*, 247 Neb. 919, 530 N.W.2d 916 (1995) (ceiling placed on income of taxicab driver by public service commission rules limiting hours driven in day shows that employment relationship between driver and cab company may exist). Against this precedent, we think we must balance the fact that DHHS did not withhold money from Perales' paycheck to pay federal income taxes or Social Security taxes from at least 1991 to 1994. Withholding of taxes "tends to indicate an employer-employee relationship, while the failure to do so is a contrary indication." *Id.* at 930, 530 N.W.2d at 923. Again the district court made no finding about this factor, and we proceed as before. The evidence is suggestive of an independent contractor relationship because DHHS did not withhold income taxes from Perales' paycheck and because the limitation on Perales' hours is imposed merely to facilitate DHHS' management of public funds. Nothing concerning this factor allows us to say that the district court was clearly wrong in its final decision.

### (h) Whether Work Is Part of Employer's Regular Business

Reeder argues that DHHS' responsibility for screening providers, obtaining physician's orders, authorizing the number of hours worked by providers, and paying those providers—combined with its interest in ensuring that providers provide appropriate care to clients—constitutes the regular work done by DHHS. But the district court found that the purpose of DHHS is to administer services provided and financed by public funds and that "the work of a licensed practical nurse is not the regular business of the defendant, [DHHS]." This finding is fully supported by the record. The provision of medical services by physicians on staff at a hospital has been found to be part of the regular business

of the hospital. See *Keller v. Tavarone*, 262 Neb. 2, 628 N.W.2d 222 (2001). We contrast this holding with the fact that the Supreme Court has said that DHHS is not in the business of providing the services of a chore provider or nurse, "but, rather, it is in the business of paying for the services pursuant to welfare programs." *Pettit v. State*, 249 Neb. at 676, 544 N.W.2d at 855. We think this same analysis applies to the provision of nursing services reimbursed by DHHS. The record and case law supports the trial court's assessment that DHHS is not engaged in the business of providing health care, which finding weighs against Perales' being an employee of DHHS.

(i) Intent of Parties Regarding Nature of Relationship

Reeder contends that Perales viewed DHHS as her employer and Wilson as her supervisor and that he believed that Perales and DHHS worked out the details of their relationship. The district court acknowledged that Perales testified she regarded Wilson as her supervisor and DHHS as her employer. However, the court observed, Perales also testified that DHHS provided her with no training or employment benefits, did not withhold income tax or social security, at least from 1991-94, and told her that she was being hired as an independent contractor. The district court noted that DHHS employees considered Perales to be an independent contractor and that they told her of that relationship. Further, the court noted that Perales and Reeder scheduled the hours she would work.

Once again, the district judge did not make any finding as to what such evidence meant to him in reaching his final conclusion. If one person in a relationship says "I am an employee" and the other side says "You are an independent contractor," what becomes important in our review are the supporting facts for a particular view; for example, the fact that Perales and Reeder set her hours and no income taxes were withheld tends to support DHHS' view of the relationship. But we make no finding on the disputed views of Perales and DHHS as to the nature of their relationship. Instead, we simply find that the evidence on this point is such that we cannot say the district court clearly erred by ultimately finding that Perales was not a DHHS employee.

### (j) Whether Employer Is "In Business"

Reeder asserts that although DHHS is a governmental agency and not a private business, it regularly employs people, and "does conduct regular and ongoing activities pursuant to standard customs, practices and procedures." Brief for appellant at 33. He further asserts that DHHS has more in common with a private business than it does a private person. The district court found that DHHS is not "engaged in business." It is noteworthy that in the chore provider case, the Supreme Court said: "[DHHS] is in the business of distributing funds, part of which come from the federal government and part of which are matching funds provided by the State, in order to permit welfare recipients to obtain needed services for which they could not otherwise pay." *Pettit v. State*, 249 Neb. at 676, 544 N.W.2d at 862. As the Supreme Court found in *Pettit*, DHHS is not in the regular business of providing chore services to elderly clients. Neither does the evidence show that DHHS is in the business of providing nursing services to disabled individuals, at least certainly not to the degree necessary to find that the district court's ultimate conclusion was clearly wrong.

### (k) Conclusion

In summary, the district court found the absence of a relationship between DHHS and Perales that would result in DHHS' having vicarious liability for any negligence Reeder alleged against Perales. In other words, the court determined that Perales was not a DHHS employee while she provided nursing care to Reeder. After our examination of the 10 factors which determine Perales' status, we cannot say that the district court was clearly wrong in its conclusion. Therefore, we affirm the court's conclusion that Perales was an independent contractor.

### 3. DHHS' VICARIOUS LIABILITY FOR PERALES' ACTIONS OR FAILURE TO ACT

■ Reeder alternatively argues that even if we agree with the district court's determination that Perales was an independent contractor, DHHS is still vicariously liable for his injuries allegedly caused by Perales' negligence because DHHS retained sufficient control over the methods and means of Perales' care of him. He cites *Haag v. Bongers*, 256 Neb. 170, 191, 589 N.W.2d 318, 333 (1999), for this proposition:

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." See, *Kime v. Hobbs*[, 252 Neb. 407, 562 N.W.2d 705 (1997)]; *Parrish v. Omaha Pub. Power Dist.*, 242 Neb. 783, 496 N.W.2d 902 (1993).

■ These cases acknowledge the general rule that the employer of an independent contractor is not liable for physical harm caused to another by the acts or omissions of the contractor or his servants. *Haag v. Bongers, supra*; *Kime v. Hobbs, supra*; *Parrish v. Omaha Pub. Power Dist., supra*. Exceptions to this general rule are recognized in these cases. The employer of an independent contractor may be vicariously liable to a third party (1) if the employer retains control over the contractor's work or (2) if, by rule of law or statute, the employer has a nondelegable duty to protect another from harm caused by the contractor. *Haag v. Bongers, supra*; *Kime v. Hobbs, supra*; *Parrish v. Omaha Pub. Power Dist., supra*.

(a) Defining Control in Context of
Employer-Independent Contractor Relationship

In *Haag*, the Supreme Court found that the employer of an independent contractor exercised sufficient control over the premises where third parties were injured due to an independent contractor's negligence that the negligence could be imputed to the employer. The Supreme Court found sufficient evidence of an employer's control of the premises in *Parrish* to create an issue of material fact making summary judgment inappropriate. The "control over the premises" doctrine typically is attempted in cases where a worker is injured at a construction site as in *Parrish*. See, *Ray v. Argos Corp.*, 259 Neb. 799, 612 N.W.2d 246 (2000); *Whalen v. U S West Communications*, 253 Neb. 334, 570 N.W.2d 531 (1997); *Sullivan v. Geo. A. Hormel and Co.*, 208 Neb. 262, 303 N.W.2d 476 (1981); *Dellinger v. Omaha Pub. Power Dist.*, 9 Neb. App. 307, 611 N.W.2d 132 (2000). But in the instant case, DHHS clearly did not exercise control over Reeder's home. Moreover, the negligence is not alleged to be

inadequate maintenance of the worksite, but, rather, inappropriate medical treatment, a completely different factual setting, making the "control over premises" cases inapplicable.

In *Kime*, a vehicle passenger who was injured in a collision with a tractor-livestock trailer driven by the tractor owner sued the rancher who owned the trailer and the livestock therein. The district court entered summary judgment for the rancher. The Supreme Court held that the tractor driver/owner was an independent contractor rather than an employee of the rancher because the rancher did not retain sufficient control over activities of the tractor driver/owner, which led to the accident, to subject the rancher to liability for the passenger's injuries. In *Kime*, the Supreme Court held that the transportation of cattle in a tractor-trailer under normal conditions is not an inherently dangerous activity such that it imposes a nondelegable duty on an employer of an independent contractor to ensure that cattle are transported in a nonnegligent manner. It requires no discussion to support the conclusion that Perales' provision of medical care to Reeder, particularly at the level of an LPN, does not constitute an inherently dangerous activity. This is not to suggest that poor or negligent care would not be dangerous to Reeder—but the provision of such care is not inherently dangerous.

We have exhaustively reviewed the control DHHS exercised over Perales and have concluded that the district court did not err by characterizing such control as administrative in nature, without influence over the means and methods Perales used to provide authorized medical services to Reeder. Thus, we cannot say that the district court clearly erred by finding no vicarious relationship between DHHS and Perales on the basis of DHHS' alleged control over Perales' provision of nursing services to Reeder.

### (b) Whether DHHS Owed Reeder Nondelegable Duty to Ensure His Safety

Our analysis of whether DHHS owed Reeder a nondelegable duty should begin with a comprehensive definition of this doctrine found in *McKinstry v. Cass County*, 228 Neb. 733, 743-44, 424 N.W.2d 322, 329 (1988):

"A nondelegable duty means that an employer of an independent contractor . . . by assigning work consequent to a

duty, is not relieved from liability arising from the delegated duties negligently performed. [Citation omitted.] As a result of a nondelegable duty, the responsibility or ultimate liability for proper performance of a duty cannot be delegated, although actual performance of the task required by a nondelegable duty may be done by another. [Citation omitted.] One on whom a nondelegable duty is enjoined may not, by employing an independent contractor, escape vicarious responsibility and liability for proper performance of that nondelegable duty. [Citations omitted.]"

Reeder's brief does not assign as error the district court's failure to find DHHS liable for Perales' alleged negligence on the basis that DHHS owed him a nondelegable duty. But Reeder weaves into his control argument the contention that DHHS had a duty to ensure his safety, and thus we deal with the theory to some extent by reference to the Supreme Court's opinion in *Reeder I*. The Supreme Court analyzed Reeder's claim that DHHS owed him an independent, nondelegable duty to supply a "care provider fully capable of meeting all of his daily nursing needs" under Neb. Rev. Stat. §§ 68-1513 and 68-1519 (1996). The Supreme Court wrote:

> [T]he statutory requirement that [DHHS] review needs of aid recipients and develop standards and procedures for determining qualified programs and services is related to a statutory duty to provide compensation for health services, not a duty to provide the actual services. [DHHS] caseworkers who serve clients receiving public assistance are not licensed health care professionals and are not authorized to make medical decisions or judgments.

*Reeder I*, 254 Neb. at 716, 578 N.W.2d at 442.

As for Reeder's contention, which he repeats before this court, that DHHS had an independent duty to protect him from injury, the Supreme Court wrote:

> In this case, there is no evidence that [DHHS] ever had knowledge that home nursing services provided by Perales posed any risk of injury to Reeder. Reeder's physician determined that Reeder required home nursing care at the level provided by an LPN, and [DHHS] verified Perales' licensure by the state before compensating her for services

she provided to Reeder. There is no evidence that Reeder or anyone else complained to [DHHS] about any services provided by Perales, or that [DHHS] was ever advised that Reeder's medical and nursing needs were not being met during the time period when his injuries allegedly occurred. Although there is evidence that Perales advised [Wilson] in May 1991 that Reeder had developed decubitus ulcers on his feet for which he sought treatment by a podiatrist, there is no evidence that Reeder, Perales, the podiatrist, or anyone else advised [DHHS] that Reeder required a different or higher level of home nursing care. Under these circumstances, we conclude that [DHHS] had no independent duty to take any affirmative action with respect to the nature or scope of health care services provided to Reeder in the absence of an employment relationship between [DHHS] and Perales, the existence of which we do not decide.

*Id.* at 717, 578 N.W.2d at 442.

However, Reeder argues that after the Supreme Court's remand in *Reeder I*, the district court hearing included evidence showing, "At a minimum, [that Wilson] had sufficient notice of an ongoing and unresolved problem to raise a duty to make further inquiry for the client's safety." Brief for appellant at 37. But, irrespective of what Wilson should have done when she learned from Perales the serious condition of Reeder's feet, Wilson's duty does not determine the nature of the relationship between Perales and DHHS. The lawsuit is not premised on a negligent failure to act on the part of Wilson which is then imputed to DHHS. In any event, the law of the case from *Reeder I* is that DHHS caseworkers are unauthorized to make medical decisions or judgments, and do not have a duty to provide the actual care as distinguished from arranging and paying for it. This, it seems to us, answers Reeder's argument.

■■■ As the Supreme Court discussed in *Reeder I*, Wilson was not required to possess medical training and the function of DHHS is primarily to ensure that the Medicaid funds allocated for the care of clients are appropriately expended. Although testimony from DHHS employees established that DHHS is concerned for the safety of its clients, that testimony primarily

addressed the issues of physical and financial abuse of vulnerable clients. And natural human concern by DHHS employees for their already ill clients does not make DHHS vicariously liable for the negligence of care providers with whom it contracts. On this record, we cannot say that DHHS or its employee, Wilson, had a nondelegable duty to ensure the safety of Reeder. This decision makes it unnecessary for us to consider Reeder's final argument that the district court erred by failing to address the issues of negligence and causation. See *Wagner v. Union Pacific RR. Co., ante* p. 1, 642 N.W.2d 821 (2002) (appellate courts are not obligated to engage in analyses not needed to adjudicate the cases and controversies before them).

## VI. CONCLUSION

The district court did not clearly err by determining that DHHS and Perales' relationship was not such as would result in vicarious liability. Further, on this record and given the Supreme Court's holding in *Reeder I*, DHHS did not owe Reeder a nondelegable duty to ensure his safety such that the alleged negligence of Perales could be imputed to DHHS. We affirm.

AFFIRMED.